UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

---

| | |
|---|---|
| Angela Posey, on behalf of herself and all others similarly situated, | Court File No. 3:11-cv-02784-JMC |
| | Class Action |
| Plaintiff, | |
| | **First Amended Complaint** |
| v. | |
| Building Materials Corporation of America, d/b/a GAF Materials Corporation, | |
| Defendant. | |

---

Plaintiff Angela Posey, on behalf of herself and all others similarly situated, by and through her undersigned counsel, brings this First Amended Complaint in class action and alleges as follows:

**Summary of Class Action**

1.      Plaintiff Angela Posey ("Plaintiff") owns a home in Lugoff, South Carolina, that has a roof shingled with Timberline shingles manufactured by defendant Building Materials Corporation of America, d/b/a GAF Materials Corporation ("GAF").

2.      GAF Timberline shingles are asphalt shingles that use a fiberglass material as their base.

3.      To be used on buildings and homes in the United States, shingles must be approved for use by state and local building codes.  Without such approval, state and local codes prohibit shingles from being installed on homes and other structures.

4.      This case seeks redress for GAF's sale of shingles that failed to meet ASTM standards but were nonetheless listed and marked by GAF as complying with ASTM standards for fiberglass shingles.

5.      Because of raw material deficiencies, improper design, and manufacturing defects, the GAF Timberline shingles on Plaintiff's home did not meet the performance requirements of ASTM D3462 at the time of sale and installation of the shingles at Plaintiff's home.

6.      These product defects cause GAF fiberglass shingles, like the Timberline Shingles used on Plaintiff's home, to prematurely crack and fail well before the end of their warranted life because the shingles uniformly fail the tear strength performance requirements of ASTM D3462 at the time of installation and have continued to degrade beyond what is anticipated or expected since the time of installation.

7.      GAF's management personnel have known for many years that defects in GAF's fiberglass shingles caused the shingles to prematurely crack and fail.  GAF, however, concealed this and failed to inform homeowners, contractors, and consumers that it had been selling shingles that did not meet ASTM D3462 and that continue to degrade beyond what is expected in the industry or by building owners.

8.      GAF has long known that its Timberline shingles have a "cracking problem" and assembled "cracking teams" to investigate the cause of the cracking.  GAF ultimately concluded that defective raw materials had caused cracking, premature failure and non-compliance with ASTM D3462 in shingles made at several of its manufacturing facilities, including its facilities in Minneapolis, Minnesota; Baltimore, Maryland; Millis, Massachusetts;

and Fontana, California. GAF was also aware that shingles made at its other plants including Mobile, Alabama, had a "cracking problem" and were failing at an unacceptable rate but claims to have never identified the cause of those defects.

9. GAF's shingles are plagued by design and manufacturing defects that result in cracking and other problems that make the shingles defective. These defects make it inevitable that the shingles begin to crack, degrade, and fail before the end of their warranted or useful life and will cause property damage to the owners of buildings with such shingles.

10. After GAF found that the raw materials and manufacturing processes that had been used in Timberline shingles were deficient, GAF changed its manufacturing specifications and process for newly manufactured shingles. But GAF did nothing to instruct or warn consumers who had already purchased shingles with the inadequate raw materials.

## Plaintiff

11. Plaintiff Angela Posey is the owner of a home in Lugoff, South Carolina, that was re-shingled with GAF Timberline shingles. At all relevant times, Plaintiff has been a resident and citizen of South Carolina.

12. On information and belief, GAF manufactured the shingles used on Plaintiff's home either at its facility in or near Goldsboro, North Carolina or Mobile, Alabama.

13. Plaintiff brings this action on behalf of herself and on behalf of the owners of homes and buildings with GAF Timberline shingles manufactured at the GAF plant in Goldsboro, North Carolina and Mobile, Alabama. These shingles are defective, failed to

comply with ASTM D3462 at the time of manufacture, sale, and installation, should never have been sold, and need to be removed or otherwise prematurely replaced from all structures.

## Defendant

14.     GAF is in the business, among other things, of designing, advertising, warranting, manufacturing, distributing, and selling roofing products.  Among the products GAF manufactures, markets, and sells are shingles used on homes and other buildings.

15.     GAF is a Delaware corporation that maintains its principal place of business and corporate headquarters in Wayne, New Jersey.

16.     GAF's marketing, sales, advertising, and warranty operations for Timberline shingles are located in New Jersey.

17.     GAF operates numerous shingle manufacturing facilities across the United States, including facilities located in or near: Mobile, Alabama; Minneapolis, Minnesota; Fontana, California; Millis, Massachusetts; Goldsboro, North Carolina; Tampa, Florida; Baltimore, Maryland; Michigan City, Indiana; Dallas, Texas.

18.     GAF's multiple facilities across the United States resulted in nationwide manufacturing and distribution of Timberline shingles.

19.     GAF claims to be North America's largest manufacturer of roofing products like fiberglass shingles.  It claims in various advertisements and on its web site that GAF Timberline shingles are the "#1 selling shingle" in North America.

3:11-cv-02784-JMC    Date Filed 05/01/12    Entry Number 19    Page 5 of 44

**Jurisdiction and Venue**

20.     This Court has jurisdiction over the parties, the putative class, and the causes of action asserted herein pursuant to Rule 23 of the Federal Rules of Civil Procedure and under the Class Action Fairness Act, 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5 million.

21.     Venue in this forum is proper because Plaintiff resides in South Carolina, some of the putative class members reside in South Carolina, the causes of action for Plaintiff arose, in part in South Carolina, and the causes of action for putative class members arose, in part, in South Carolina.

22.     GAF conducts business within South Carolina, delivers product to South Carolina, purposefully directs sales and marketing efforts to South Carolina and its residents, and maintains business facilities in South Carolina.

**Factual Background**

**GAF's Manufacture of Timberline Shingles**

23.     All GAF Timberline shingles are manufactured using the same basic formula: a base layer of fiberglass material is saturated with asphalt, a middle layer of asphalt coating, and a top layer of mineral granules with a strip of asphalt sealant.

24.     The manufacturing process for these shingles is essentially identical regardless of the length of the warranty provided with the product.  Timberline shingles are two-piece laminate shingles made from the same materials that are then laminated together with the top portion cut into a pattern for aesthetic purposes.

25.    Fiberglass mat serves as the base or foundation for the shingle and is referred to as the "mat."

26.    GAF manufactured its own fiberglass mat in only two plants in the United States and followed the same manufacturing process in each.  As a result, the fiberglass mat for all Timberline shingles at issue in this lawsuit is common.

27.    A large percentage of a shingle's strength relates to the properties of the mat. Because of errors and defects in the manufacture, materials, and design of the fiberglass mat, Timberline shingles are uniformly defective and begin prematurely cracking, failing, and degrading when installed in their intended application.

28.    GAF notes on its web site that a homeowner's choice of roof is paramount because the roof's purpose is to "protect their biggest asset."

29.    GAF manufactures Timberline 30, Timberline 40, and Timberline Ultra shingles.  The numbers after the first two product names represent the warranted life of the shingle: 30 years and 40 years.  Timberline Ultra shingles were sold with a 40-year and a lifetime warranty.

30.    GAF's warranties are marketed and create an expectation within the industry and by consumers that the shingles will last as long as the warranty period without cracking and failing.  GAF charged more for shingles with longer warranties, which further created an expectation that a longer warranty period advertised and guaranteed by GAF had meaning.

31.    GAF markets and warrants the Timberline shingles as durable and offering long-lasting protection for a specified life as designated in the name of the shingle.  The

industry and consumers recognize the warranty nomenclature as having meaning because a shingle with a 30-year warranty is referred to as a "30-year shingle."

32.    GAF representatives, including Regional Quality Manager, Paul Miller, have conceded that the warranty representations about GAF shingles, however, were simply a "marketing tool."

33.    Despite using promises of lengthy warranties to sell its shingles, GAF did not perform product testing to allow it to determine long-term performance or how long its shingles would actually last.

34.    GAF did not perform appropriate testing to determine whether warranty periods it provided with Timberline shingles would be realized in real world conditions. GAF did not use engineering analysis to determine the length of its warranties but instead extended the length of the warranties as the business environment changed or to meet or beat warranties offered by competitors.

**ASTM D3462**

35.    Purchasers and users of shingles require that manufacturers of shingles certify that the shingles comply with standards promulgated by relevant certification and standards organizations.

36.    ASTM International ("ASTM") is a standard-setting organization that establishes and maintains minimum industry standards for many different products. ASTM is an acronym that stands for "The American Society for Testing and Materials." Its committees are made up of industry representatives, including representatives from GAF.

37.     ASTM establishes engineering and product testing standards. Shingles are among the products for which ASTM has developed standards and product testing programs. ASTM D3462 – Standard Specification for Asphalt Shingles Made from Glass Felt and Surfaced with Mineral Granules – is recognized by the roofing industry as the critical standard for fiberglass-reinforced asphalt shingles.

38.     Model building codes in the United States reference ASTM D3462 as the minimum requirement for product performance for fiberglass-reinforced asphalt shingles. As a result, shingles that do not comply with ASTM D3462 cannot be legally installed on homes and buildings in the United States.

39.     One requirement of ASTM D3462 is that the fiberglass shingles pass certain tear strength tests that measure the shingles' ability to withstand tearing and cracking.

40.     If manufacturers of fiberglass shingles do not warrant their compliance with the applicable standards—including ASTM 3462—consumers or the consumers' agents would not purchase those shingles and would instead purchase competitor shingles that did in fact meet the applicable standards.

41.     Fiberglass shingles that do not meet ASTM D3462 do not meet industry standards, are not marketable, have no market value, and could not be sold to consumers at any price.

**Prior Cracking Problems and Class Action Settlement for GAF Timberline Shingles**

42.     Because of problems with cracking in its shingles, GAF was previously named as a defendant in lawsuits. Included in those suits was a putative class action titled *Coleman,*

*et al. v. GAF Building Materials Corporation*, CV-96-0954 (Alabama Circuit Court, Mobile County).

43.     GAF ultimately settled the *Coleman* lawsuit by paying more than $13 million to resolve claims involving cracking shingles.  Only shingles manufactured before December 31, 1997, were included in that class action settlement.

44.     Plaintiff's GAF Timberline shingles were manufactured after December 31, 1997, and were therefore not included in the *Coleman* class action settlement.

**Cracking Studies and Their Concealment From Consumers**

45.     By the late 1990s, GAF had received reports of problems with cracking in its fiberglass shingles, including the Timberline Ultra shingles used on Plaintiff's home.  GAF conducted a number of internal analyses of the cracking problems and issued reports.  For example, GAF concluded that cracking claims for GAF laminated fiberglass shingles increased 43% from 2001 to 2002 alone.

46.     By 2002, GAF had spent several million dollars responding to claims brought by consumers for cracking shingles.  The GAF Senior Vice President of Operations for all GAF manufacturing plants at that time, Ken Walton, directed GAF employees to further investigate the cracking problems.

47.     By 2003, the cracking of shingles manufactured in GAF's Minneapolis facility was the "fastest growing problem" facing GAF.  In response to this problem, GAF created a team of personnel to study and investigate why its shingles were cracking well before the end of their warranted or useful life.

48.    A report completed in 2006 by GAF employees Sudhir Railkar and Adem Chich documented that GAF had received 10,170 cracking complaints for Timberline shingles through 2002.  The average age of the roof subject to a cracking complaint was only seven years.

49.    The Railkar-and-Chich report also documented that cracking complaints had been received for shingles manufactured in every GAF manufacturing facility and had been received from properties located throughout the United States.

**Internal GAF Testing Proves its Shingles Will Crack and Fail Prematurely**

50.    GAF's former Director of Central Quality Assurance, Guy Gimson, admitted in sworn testimony that he was asked by his supervisor, Ken Walton, to produce a Central Quality Assurance ("CQA") report relating to cracking problems being reported with GAF shingles.

51.    By the time Ken Walton had requested this CQA report on shingle cracking, GAF had already concluded that the shingle-cracking problem spanned across manufacturing facilities and geographic locations.

52.    In response to the growing shingle-cracking problems, GAF and its employees, led by Guy Gimson, held a number of technical meetings to investigate and analyze these problems.

53.    In 2002-2003, Guy Gimson issued a CQA report that outlined the findings of the study and the cracking team efforts.

54.    Among the problems GAF identified were "cold weather cracking" failures of shingles manufactured by its Minneapolis facility.

3:11-cv-02784-JMC    Date Filed 05/01/12    Entry Number 19    Page 11 of 44

55.    In August 2003, Guy Gimson authored a CQA report titled "Minneapolis Shingle Cracking" and outlined testing done by GAF that proved that its laminated fiberglass shingles, including its Timberline shingles, cracked at low temperatures.

56.    In other internal documents, including documents titled "Problem Analysis," the "State the Problem" section of the internal GAF document stated: "Shingles made in Minneapolis are cracking during warranty preview."  The time frame given in that document for the problem being analyzed was "Product manufactured since the 1980s."

57.    At about the same time, the GAF quality assurance personnel also identified cracking problems in shingles manufactured in its Mobile, Alabama, and Dallas, Texas, facilities.  Internal GAF documents describe the laminate shingles as having a "high failure rate" in all territories and climates in which they were sold.

58.    Internal GAF documents also analyze shingle cracking and failure problems related to shingles manufactured in its facilities in Baltimore, Maryland; Millis, Massachusetts; and Fontana, California.

59.    GAF also investigated cracking problems reported in North Carolina related to shingles manufactured in its Mobile, Alabama, facility and even assembled a "Mobile cracking team" to assess the problem.

60.    Documents generated by the Mobile Cracking Team explained that cracking had been seen in "all Mobile laminated products since 1989," which had affected "all roof types and pitches," and was not "local to one area (state, county, city)."

61.    Documents generated by the Mobile Cracking Team explained that "Mobile laminates have a high failure rate for short term cracking (4-6 years)."

62.    Despite devoting substantial time to the cracking problems, which GAF described as uniform and widespread, GAF engineers admitted that they were not able to determine why the shingles prematurely crack.

63.    Ultimately, GAF determined the cause of the cracking problems in the Minneapolis, Baltimore, Millis, and Fontana facilities.  GAF corporate representatives, including Guy Gimson and Ken Walton, knew about the findings and conclusions of these studies.

64.    GAF determined that defects or deficiencies in the manufacturing process and raw materials used in Timberline and other laminate fiberglass shingles caused those shingles to prematurely crack and fail.

65.    GAF never, before this litigation, concluded that the cracking problems in its Timberline and other laminate fiberglass shingles were caused by improper installation or anything attributable to the purchasers of the shingles.

66.    In response to its internal investigation, analysis, and conclusion that improper raw materials had caused the cracking failures, GAF changed its raw materials specifications for its Timberline fiberglass shingles.

67.    Even after concluding internally that it had been manufacturing shingles with defective raw materials and manufacturing processes, GAF concealed—from consumers, contractors, and state and local code officials—the fact that it had manufactured Timberline shingles that failed to comply with ASTM D3462 and were cracking when used as intended.

68.    Although it changed its own materials specifications and manufacturing processes because it knew that its old specifications produced shingles that could not meet

ASTM D3462 requirements and cracked when used as intended, GAF concealed from contractors, distributors, regulatory authorities, and consumers that it had long been selling shingles that were of inferior quality, could not meet ASTM D3462's performance requirements, and would crack or otherwise be damaged and fail when used as intended.

69.    Instead of acting honestly and responsibly to minimize harm to its customers and consumers, GAF chose to continue its scheme to conceal these defects and simply changed its internal raw materials specifications without advising consumers of the problems associated with Timberline shingles.

70.    GAF employees involved in this scheme included, but were not limited to, Guy Gimson, Walt Workman, and Ken Walton.

71.    For example, GAF District Manager Kevin Hull raised concerns about vertical cracking of shingles noting that they were "kicking my a***" to which GAF regional manager JD Hasselbach responded: "yes I know all about the millions of dollars we are paying in claims and class action suits.  "Cut out the email traffic on this as it can be used in court against us.  You are not telling me anything new . . . Just keep selling."

72.    The failure to comply with ASTM D3462 requires that all homes or properties with GAF Timberline shingles manufactured after December 31, 1997, be re-roofed with shingles that comply with ASTM D3462.

**Cracking of GAF Shingles is Caused by Manufacturing and Design Defects**

73.    The manufacturing and design defects described in this First Amended Complaint are present in GAF shingles from the time they were manufactured and exist regardless of how or where the shingles are installed.

74.    GAF admitted internally, and without telling the public, that the defects in its shingles caused the shingles to experience the same vertical cracking.

75.    The vertical cracking, degradation, and damage to the GAF shingles begin upon their installation and become worse with time.  GAF Timberline shingles are non-conforming.  All GAF Timberline shingles at issue in this litigation are defective, not merchantable, and are damaged and failing before the time periods advertised, marketed, and guaranteed by GAF.

76.    Internally, GAF employees conceded in emails that "it is not a matter of if but when" the shingles will crack and fail.

77.    GAF concluded internally, and without telling the public, that 5% or more of its fiberglass shingles will crack when installed and used as intended.  Because there are typically hundreds of shingles on a home or structure of average size, it is a statistical certainty that every home or structure with these shingles will suffer vertical cracking of a substantial number of the shingles.  For example, a 1% defect rate in GAF shingles means that the chance that an average size structure with 30 squares of shingles (about 600 shingles) would not have cracked shingles is 1 in 506,800,000.

78.    Cracked shingles cause water to leak past the shingles, which in turn causes damage to property owned by Plaintiff and class members other than the shingles themselves (including other roofing material, the roof itself, structural elements, interior walls and ceilings, and building contents).

**False Advertising and Misbranding of GAF Timberline Shingles**

79.    GAF's sales and marketing brochures were widely distributed to building and roofing professionals who installed shingles and were generally available to Plaintiff, contractors, and consumers at the time of purchase.  In addition, GAF maintained a web site, www.gaf.com, which provided sales and marketing literature to the public.

80.    GAF markets and advertises its Timberline shingles as being "the heaviest and longest-lasting fiberglass asphalt shingle in the Timberline series" and that their design "promotes longest life and extra durability."  (www.gaf.com; 4/27/99).

81.    GAF markets and advertises Timberline shingles as possessing "superior strength and improved weathering in harsh conditions" because of its "Micro Weave Core" fiberglass felt.  (www.gaf.com; 4/27/99).

82.    GAF Timberline shingles in fact do not have "superior strength and improved weathering in harsh conditions" and have instead suffered from immediate damage, degradation, and cracking that begin upon installation.

83.    GAF also markets, advertises, and states on its Timberline packaging that the shingles meet ASTM D3462.

84.    Compliance with ASTM D3462 is a material requirement and term for the purchase of fiberglass shingles.

85.    For at least 10 years, GAF's internal performance testing of its Timberline shingles had indicated significant problems with the shingles' compliance with ASTM D3462.

86.    In virtually every piece of marketing materials associated with GAF Timberline shingles, GAF falsely claimed that the shingles complied with ASTM D3462. For the reasons stated herein, these statements were false and misleading because the shingles actually produced and sold to consumers did not meet ASTM D3462 requirements.

87.    GAF made these false statements every time it sold GAF Timberline shingles in packages that were all stamped with ASTMD3462, which falsely claimed that the shingles complied with that standard.

88.    Because the GAF Timberline shingles did not meet ASTM D3462, GAF falsely represented and advertised that those shingles complied with the standard.

89.    GAF's marketing and sales materials also falsely represented the true certifications and characteristics of the Timberline shingles.  For example, in sales brochures GAF falsely claimed that the shingles met ASTM D3462.

90.    In marketing and sales brochures, GAF shingles are falsely represented as meeting ASTM D3462 requirements and were high-quality shingles that would last for decades without problems.

91.    GAF continued to publicly disseminate these brochures, which contain the false and misleading information described herein, until just recently.  Similar brochures continue to be listed at GAF's web site, www.gaf.com.

92.    GAF also falsely claimed on its web site that: "Because of our state-of-the-art manufacturing process, the odds of you having a problem with a new GAF roof is about one in a thousand."  This statement was false and GAF has been unable to produce any scientific support for the statement.  This statement was actually contradicted by the GAF testing

referenced in this First Amended Complaint, and confirmed by GAF's head of quality assurance, Guy Gimson, that more than 5% of Timberline shingles experienced premature vertical cracking.

93.    GAF also represented to distributors and installers that its shingles and the fiberglass mat contained within the shingles provide "Balanced <u>Tear Strength</u> in all directions" and "Balanced <u>Tensile Strength</u> in all directions", which GAF claimed to result in "Better Resistance to Expansion-Contraction Cycles," "Better Overall Performance . . . No Directional Weakness," and "Longer Life." *See* GAF3226 and GAF3235 produced in *Brooks v. GAF.*

94.    GAF representatives, including Adem Chich, GAF's Director of Research & Development, have conceded that the claims made in the preceding paragraph are inaccurate.

95.    GAF represented to Plaintiff and the putative class members in documents generally available to them and contractors that its shingles would last a specified period of time without problems and that the company would remedy the problem.  GAF made these representations before purchase and at the time of purchase via sales brochures, marketing materials, and its web site.

96.    In contrast to its sales and marketing statements about the Timberline shingles, Mike Ferraro, GAF's Vice President of Engineering Services, conceded that there was no other problem at GAF "that was more extensive, had more involvement at the highest levels" than the vertical cracking problems of the Timberline shingles.

97.    Each of the false statements and misrepresentations made in the preceding paragraphs were repeatedly restated by GAF's sales personnel and their manufacturer's representatives, in the course of every sale of GAF shingles.  GAF, however, knew at the time these statements were provided to consumers, suppliers, and contractors that the statements were false and unsupported.

98.    At all times and in all communications with consumers, suppliers, and contractors, GAF and its representatives knowingly misrepresented that GAF Timberline shingles were fit and suitable for use in new home construction, remodels, and repairs when in fact the shingles did not meet ASTM D3462 and therefore did not meet applicable building code requirements.

99.    At all times and in all communications with consumers, suppliers, and contractors, GAF and its representatives knowingly misled consumers into believing that GAF shingles complied with ASTM D3462 and were therefore legal to use on roofing projects.

100.    Whether the shingles complied with ASTM D3462 was a material fact for the consumers and purchasers of GAF Timberline shingles.  GAF through misrepresentations, knowing omissions, and other sharp business practices misled consumers and otherwise concealed the true nature of the shingles with the intent that consumers and purchasers rely on those representations and omissions.

101.    In addition to the representations made in their advertising materials and on their web sites, the Timberline shingles packaging sold by GAF had stamps indicating that the shingles conformed to ASTM D3462.  When a product or packaging is marked with the

ASTM designation D3462, the product is represented to have been manufactured, tested, inspected, and sampled in accordance with that standard and has been found to meet the standard's requirements.

102.    When GAF and its representatives made each of the affirmative misrepresentations outlined herein, GAF knew or should have known that the representations were false and / or misleading.  When marking its shingles packaging with an ASTM D3462 designation, GAF and its representatives intended that consumers, purchasers of these shingles, roofing contractors, and code officials would rely on the false and misleading statements.  Plaintiff and her representatives, as well as local officials, received and relied on such representations.

103.    GAF's shingles, however, did not comply with ASTM D3462's tear strength requirements and therefore could not comply with ASTM D3462.  GAF knew or should have known that its advertising statements about compliance with ASTM D3462 were false. GAF knew or should have known that its certification of compliance with ASTM D3462 by stamping that designation on every shingle package was false.

104.    GAF was obligated to disclose the defects, use of substandard materials, and non-compliance with industry standards because such disclosure was necessary to qualify affirmative representations made about GAF Timberline shingles and to make such representations non-misleading.  The failure to inform consumers about these problems rendered GAF's affirmative representation about the shingles materially misleading.  Such disclosure was also necessary because GAF was uniquely in possession of facts it did not disclose, knew that such facts were not available to Plaintiff and the putative class members,

and knew that such facts that had been knowingly omitted would be material to any prospective purchase of the Timberline shingles.

105.    At all times and in all communications with consumers, suppliers, and contractors, GAF and its representatives knowingly misled consumers into believing that Timberline shingles complied with ASTM standards.  Plaintiff, her representatives, and other consumers relied on these misrepresentations because the shingles could not have been used in the United States without compliance with those standards.  GAF, therefore, passed off its shingles as being of a particular quality, standard, or grade that they were in fact not.

106.    Plaintiff, her representatives, and other consumers believed, based on GAF's representations, that she was purchasing shingles that complied with ASTM D3462 and that complied with state and local building codes.  Plaintiff, her representatives, and other consumers would not have purchased GAF shingles or properties that used those shingles if they had known the truth about the shingles.

107.    Plaintiff, her representatives, and other consumers believed, based on GAF's representations, that GAF used proper materials for Timberline shingles and would not have bought the shingles if GAF had disclosed the truth about its "cracking problems," "cracking teams," or the fact that it had concluded that there was materials problem with these shingles.  No reasonable consumer or contractor would have bought these shingles if GAF had not concealed this important information.

**GAF's On-Going Warranty Handling Misconduct and Refusal to Notify Consumers of the Known Defects in the Shingles.**

108.    Although it had received more than 10,000 cracking claims by 2002, GAF continued to conceal the true nature of the defect in the shingles used on Plaintiff's and class

members' homes and buildings. GAF uniformly fails to advise consumers about the cracking problems, "cracking teams," or substandard materials used in GAF Timberline shingles.

109.    Similarly, GAF has refused to convey effective notice to consumers about the shingle defects and refused to repair or replace defective roofs or to fully pay for the damage caused by the premature cracking, damage, and failure of its shingles.

110.    GAF has also implemented a policy of trying to force consumers to accept terms that were not required by the GAF express warranty. In addition, GAF attempted to impose unenforceable limitations on the scope of the warranty coverage and its obligations to consumers. For example, GAF attempts to force Plaintiff and consumers to swear, under the penalty of perjury, that "any compensation will be applied to the repair or replacement of the GAF, Elk or GAF-Elk shingles described herein, and if such compensation is not so applied, the Undersigned agree(s) to notify any subsequent purchaser of your building . . . that this Claim has been made; or to record this Claim in the appropriate public title records concerning the property of your building."

111.    GAF had no legal right to demand or condition its payment of express warranty obligations on Plaintiff's or any other consumer's acquiescence to the demands set out in the preceding paragraph.

112.    GAF also attempted to force Plaintiff and other consumers to swear, under the penalty of perjury, that "The Undersigned also agree(s) that if the foregoing disclosures are not made in the manner required above, the Undersigned will indemnify GAF-Elk

Corporation for the amount of any compensation made to a subsequent purchaser of your building for the same dammar or repair expenses claimed herein."

113.    GAF had no legal right to demand or condition its payment of express warranty obligations on Plaintiff's or any other consumer's acquiescence to the demands set out in the preceding paragraph.

114.    GAF made the unsupported and unlawful demands described in the preceding paragraphs in preprinted and uniform "Claim Form for Shingle Damage" forms GAF used to process warranty claims for all of its shingles.  Upon information and belief, GAF has uniformly demanded that consumers acquiesce to the unsupported and unlawful demands in the Claim Form for Shingle Damage as described herein.

**Plaintiff's Circumstances**

115.    Plaintiff Angela Posey owns a home in Lugoff, South Carolina, that has a roof shingled with GAF Timberline shingles.

116.    On information and belief, the GAF shingles on Posey's home were manufactured at GAF's facility in or near either Goldsboro, North Carolina or Mobile, Alabama.

117.    Plaintiff purchased a set of GAF shingles in or around June 1999 which proved defective, and made a warranty claim.

118.    The packaging of the shingles delivered to and used on Posey's home was stamped with an ASTM D3462 designation, implying that the shingles complied with ASTM D3462.

119.    Plaintiff reasonably believed that the GAF Timberline shingles used on her home met all listing and code requirements and expressly relied on the ASTM D3462 designations placed on the shingles packaged by GAF.

120.    Plaintiff, when purchasing GAF Timberline shingles, reasonably expected that the shingles complied with all listing and code requirements and Plaintiff relied on the accuracy of the designations affixed to the shingles and their packaging.

121.    Before purchasing and deciding to install GAF Timberline shingles at her home, Plaintiff was told that GAF provided a 25-year warranty for the shingles.

122.    Plaintiff reasonably relied on GAF's representations about compliance with ASTM standards and code compliance when deciding to purchase the GAF shingles with the express warranty and that a 25-year shingle would be robust enough to provide roofing protection for that length of time.

123.    Because of GAF's conduct outlined herein, Plaintiff and members of the putative class did not know, and could not have known, that their shingles did not comply with ASTM D3462 and local code requirements at the time of sale and installation. Moreover, GAF's conduct has prevented class members from discovering that their shingles are defective and that remediation was necessary to rectify the non-compliance and its concomitant risks and problems.

124.    GAF at no time disclosed to Plaintiff the cracking problems their shingles had, and never disclosed the findings of the cracking teams.

125.    Because of GAF's conduct outlined herein, Plaintiff and members of the putative class did not know, and could not have known, that their shingles were defectively

manufactured, made from substandard and defective materials, had a "cracking problem," and were the subject of "cracking teams" investigations at the time of sale and installation. Moreover, GAF's conduct has prevented class members from discovering that their shingles are defective and that remediation was necessary to rectify the non-compliance and its concomitant risks and problems.

126.    GAF's conduct outlined herein was intended to and did in fact fraudulently conceal its conduct and, as a result, tolled the statute of limitations for Plaintiff and members of the putative class.

127.    Because GAF concealed the fact that its shingles were made from inappropriate materials, did not comply with ASTM D3462, had a cracking problem, and in fact affirmatively alleged that the shingles complied with ASTM D3462, Plaintiff did not, and could not have discovered the defects in the shingles because no reasonable consumer would have the ability to independently discover these facts.

128.    Plaintiff, having been assured that, as a long-lasting, heavy and durable product, GAF shingles would last through the life of the warranty, did not know of the problems with the shingles, until she experienced cracking of her shingles within the last two years.

129.    The cracking process and damage to these shingles is present and underway even before the problems are noticed by a consumer or contractor.

130.    Until her cracking began, Plaintiff had no reason to know that GAF had placed in the stream of commerce defective and misbranded shingles.

131.    Shortly after discovery, Plaintiff contacted GAF, which continued to conceal the true nature of the defect in the shingles used on Plaintiff's home.

132.    GAF's conduct outlined herein was intended to and did in fact fraudulently conceal its behavior and, as a result, tolled the statute of limitations for Plaintiff and members of the class.  By affirmatively representing that their shingles met the ASTM D3462 standard, were of superior quality, were the heaviest and longest-lasting shingles of their kind, could withstand harsh conditions and would last for the life of the warranty, GAF engaged in trickery and artifice to prevent Plaintiff from discovering the defects in Timberline shingles.  The affirmative acts in which GAF engaged to conceal facts about the true quality of the shingles, through advertising, labeling and marketing, were calculated to hinder discovery by ordinary diligence.  GAF's affirmative misrepresentations involve acts of low moral turpitude, which could only be undertaken by a corporation intending to mislead consumers into purchasing a defective product.

133.    Plaintiff, like all class members, has a real and present injury in that she owns a home with substandard shingles that do not comply with ASTM D3462.

134.    Plaintiff's shingles have caused damage to Plaintiff's home, including, without limitation, the cost to replace the shingles to become code compliant and to avoid further damage to other parts of the structure caused by the defective and cracking shingles. Likewise, Plaintiff and class members have incurred or are reasonably certain to incur, the cost of repairing the damage to their other property that was caused by GAF's sale of defective shingles.

135.    Plaintiff and the proposed class members suffered damage to property other than the GAF shingles.  Plaintiff and class members suffered general and specific compensatory and contractual damages including, without limitation consequential, incidental, loss of use, diminution of value, attorneys' fees, costs and disbursements.

## Proposed Class Definitions

136.    Plaintiff brings this class action on behalf of herself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The first proposed class is defined as:

> All persons and entities that own or owned a structure within South Carolina that contains or contained Timberline shingles manufactured from December 31, 1997 to the present in GAF Material Corporation's facilities in either Goldsboro, North Carolina or Mobile, Alabama.

137.    Alternatively, Plaintiff brings this class action on behalf of herself and all others similarly situated, for all claims alleged herein, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for a second proposed class or subclass defined as:

> All persons and entities that own or owned a structure within certain of the United States that contains or contained Timberline shingles manufactured from December 31, 1997 to the present in GAF Material Corporation's facilities in either Goldsboro, North Carolina or Mobile, Alabama.

138.    Plaintiff specifically excludes GAF and its related entities from the putative class, all subsidiaries or affiliates of GAF; any entity in which GAF has a controlling interest; and any and all of GAF's employees, affiliates, legal representatives, heirs, successors or assignees.

139.    Plaintiff also excludes from the putative class any person or entity that has previously commenced and concluded a lawsuit against GAF arising out of the subject matter of this lawsuit.

140.    Plaintiff also specifically excludes from the putative class the judge assigned to this case and any member of the judge's immediate family.

141.    Plaintiff and her counsel reserve the right to modify or amend the class definitions, as appropriate as this case proceeds.

## Satisfaction of Class Prerequisites

142.    This class action satisfies numerosity, commonality, typicality, adequacy and superiority requirements for maintaining a class.

143.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims, and can disprove GAF's defenses, using common, class-wide evidence.  Such evidence includes GAF's own internal documents confirming that GAF had used substandard manufacturing processes and materials, which it subsequently abandoned.

144.    **Numerosity.**    Pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the putative class "is so numerous that joinder of all members is impracticable." The number of members of the putative class is at least thousands of individuals and/or entities that own properties with GAF Timberline fiberglass shingles.

145.    Joinder of the persons and entities whose properties use GAF Timberline and other fiberglass shingles is impractical and not feasible.

146.    **Ascertainability.**    Membership in the putative class is easily ascertained through the ownership of GAF Timberline shingles.

147.    GAF shingles are unique in their appearance and can be easily distinguished from shingles made by other manufacturers by virtue of their appearance and packaging. Many class members, like Plaintiff, have installation documents or documents from contractors identifying the GAF shingles.

148.    GAF's Warranty Service Department maintains a database of information about warranty claims it receives, including the consumer's name and the location of the structure with GAF shingles.  This database further provides identifying information for members of the class.

149.    When it receives warranty claims from consumers, GAF is able to identify that it manufactured the shingles and is able to identify the type of shingle through identifying information on the shingle.

150.    GAF shingles are stamped with identifying information that identifies at which plant and when the shingles were made.  This information makes it possible to know when and where each GAF Timberline shingle was manufactured.

151.    GAF also receives and maintains warranty registration forms from consumers and maintains those forms in a repository.  This warranty registration repository provides further identifying information for members of the class.

152.    There are also known distribution patterns of GAF shingles made in each GAF manufacturing facility, which will further allow the members of the putative class to be identified.

153.   **Commonality.**   Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, the putative class shares "questions of law or fact" that predominate and individualized issues.   The evidence in this case will provide answers to questions that are common to members of the class.   Those questions, for which common evidence will provide answers, include, but are not limited to, the following:

- Were GAF's shingles defectively designed for their intended application, and if so, what is the nature of the design defect?

- Were GAF's shingles defectively manufactured for their intended application, and if so, what is the nature of the manufacturing defect?

- Did GAF fail to instruct or to warn consumers its shingles failed to meet ASTM D3462 requirements at the time of sale and installation?

- Were the GAF shingles unmerchantable when they left GAF's control?

- Did GAF adequately instruct or warn consumers about the cracking propensities of its shingles?

- Did GAF make fraudulent, false, deceptive and/or misleading statements in connection with the sale of its shingles in its packaging and product literature?

- Did GAF omit material information when it sold its fiberglass shingles?

- Did GAF utilize misrepresentations, knowing omissions, or other sharp business practices when it advertised, marketed, and sold its fiberglass shingles?

- Did GAF exercise reasonable care in the design, manufacture and testing of its fiberglass shingles?

- Did GAF deliberately sell or allow fiberglass shingles to be distributed after it knew the shingles could not meet ASTM D3462?

- What categories of damages are recoverable for owners of structures with GAF fiberglass shingles, e.g., replacement, consequential, incidental or other damages?

- Is Plaintiff entitled to relief under GAF's express warranties?

- Is GAF able to condition express warranty payments on consumers' acquiescence to demands by GAF that are not contained in any express warranty?

- Is GAF obligated to provide a post-sale warning or instruction to the owners of buildings that use its fiberglass shingles?

- Can the class obtain a declaration concerning the types and categories of damages and remedies available to putative class members?

154.   **Typicality.**   Pursuant to Rule 23(a)(3) of the Federal Rules of Civil Procedure, the claims of the putative class representative "are typical of the claims … of the class."   Plaintiff and all members of the putative class who own GAF's defective shingles have suffered damages as a result of GAF's wrongful acts and misconduct.   Pursuant to corporate directives, GAF engaged in a similar pattern of misconduct towards both the Plaintiff and all the other putative class members.

155.   **Adequacy**.   Pursuant to Rule 23(a)(4) of the Federal Rules of Civil Procedure, the putative class representative "will fairly and adequately protect the interests of the class."   Plaintiff has no adverse interests to the putative class members.   Plaintiff was sold or installed defective and mislabeled GAF shingles.   Plaintiff has retained lawyers who have substantial resources, experience, and success in the prosecution and defense of class action, mass tort and complex litigation, and the insurance coverage and settlement issues attendant to the same.

156.   **Superiority.**   Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, a class action is a superior method of resolving this action for the following reasons:

a.     A class action in this instance conserves the resources of the putative class, GAF and the Court.   The damages of most putative class members are not, in

isolation, significant enough to hire an attorney on a contingency basis, and the burden and expense of hiring an attorney on a per diem basis for Plaintiff and most putative class members, makes it difficult if not impossible for the class members to seek redress. The costs of retaining an expert to issue a report, be deposed, and to appear and testify at trial is substantially more costly than the value of the average claim is worth absent a fess shifting statute.

b.      On information and belief, no Attorney General of any state has brought an enforcement action against GAF to remedy the claims asserted herein.

c.      There are other cases pending against GAF. Serial adjudications in numerous venues are not efficient, timely, or proper. Judicial resources throughout the United States will be unnecessarily depleted by resolution of individual claims.

d.      Individualized judgments and rulings could result in inconsistent relief for similarly situated plaintiffs. Individualized lawsuits could also establish incompatible standards of conduct for GAF in creating, marketing, sale and post-sale conduct in connection with its fiberglass shingles.

## Count I

### (Breach of Express Warranties)

157.    Plaintiff and the putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

158.    GAF made certain express warranties to distributors, contractors, and consumers about the shingles it would provide.

159.    The express warranties provided by GAF included warranties that GAF Timberline shingles were fit and suitable for use on homes and other structures, would be non-defective and merchantable, and complied with ASTM D3462. Such warranties were made in the product literature described in this First Amended Complaint and on the packaging of the shingles.

160.     Compliance of these shingles with ASTM D3462 was a separate and distinct warranty that was material and uniformly relied upon by all members of the putative class and their representatives.

161.     The express warranties provided by GAF also included warranties that GAF Timberline shingles were warranted and would perform adequately for 30, 40, or more years. GAF used the same or substantially the same warranty terms for all Timberline shingles sold during the time at issue in this case.

162.     Shingle distributors, contractors, code and local officials, Plaintiff, and the putative class members relied upon GAF's express warranties.

163.     GAF breached its express warranties by manufacturing and selling shingles that were defective, did not meet ASTM D3462 requirements, and were not suitable for use on homes and other structures in the United States.

164.     GAF also breached its express warranties by refusing to pay the full amount owed to Plaintiff and other members of the putative class and by attempting to condition payment under those warranties on demands made by GAF that were not part of those warranties.

165.     GAF also breached its express warranties by refusing to pay the full amount owed to Plaintiff and other members of the putative class and by attempting to limit its obligation under express warranties by attempting to enforce unenforceable or unconscionable disclaimers or limitations.

166.    As a direct, proximate and foreseeable cause of GAF's breach of express warranties, Plaintiff and the putative class members sustained damages in an amount to be determined at trial.

## Count II

## (Breach of Implied Warranties)

167.    Plaintiff and the putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

168.    GAF was at all relevant times a merchant with respect to its Timberline shingles and that there was implied in the agreements between GAF, GAF's representatives and Plaintiff and putative class that such goods would be of merchantable quality.

169.    There was implied in the agreements between GAF, GAF's representatives and Plaintiff and putative class that GAF shingles would comply with ASTM D3462, would comply with building codes, and would be fit for use on structures and homes.

170.    GAF breached such warranties implied in the agreements and contracts by producing, marketing, and selling defective and unmerchantable shingles.  As a result thereof, Plaintiff and the putative class did not receive goods as impliedly warranted by GAF to be merchantable.  Plaintiff and proposed class members are beneficiaries of the contracts and their implied warranties.

171.    As a direct, proximate and foreseeable cause of GAF's breach of implied warranties, Plaintiff and the putative class members sustained damages in an amount to be determined at trial.

## Count III

## (Negligence)

172.    Plaintiff and the putative class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

173.    GAF was negligent in that it failed to use reasonable care when it designed, tested, manufactured, marketed, and sold Timberline shingles.

174.    As the designer, tester, manufacturer, and / or seller of consumer products, GAF owed a duty to Plaintiff and the putative class members to provide a safe and quality product, and a duty to provide a product that was properly certified and labeled for use on homes and other structures.  GAF breached those duties.

175.    As a direct and proximate result of GAF's negligence, lack of care, and other wrongful acts, Plaintiff and the putative class members sustained and will sustain damages.

176.    As a result of GAF's negligence, Plaintiff and the putative class have suffered actual damages in that they have purchased and installed in their homes and structures, shingles that are defective, unreasonably dangerous and unsuitable for their intended use.

177.    The degradation and failure of GAF's shingles causes damage to property other than the shingles themselves both while in use and during the removal and reinstallation process.

178.    As a result of GAF's negligence, Plaintiff and the putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, damage to property other than the GAF shingles, consequential, and incidental damages.

179.    As a direct, proximate and foreseeable result of GAF's negligence, Plaintiff and the putative class members have been damaged in an amount to be determined at trial.

## Count IV

### (Negligent Failure to Instruct or to Warn)

180.    Plaintiff and the putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

181.    As the designer, tester, manufacturer, and seller of a consumer product, GAF had a duty to provide accurate labeling and written materials for its products.

182.    As the designer, tester, manufacturer, and seller of a consumer product, GAF had a duty to instruct or to warn of foreseeable dangers inherent in the proper use of its products and to properly label and package its products.

183.    GAF was aware that its Timberline shingles had a propensity to crack and did not comply with ASTM D3462 at the time of sale and installation and, as a result, should not and could not be used for their intended purpose.

184.    Despite the fact that GAF knew its Timberline shingles were defective and should not be used, GAF continued to sell the products to the public without correction and, in fact, concealed from the public the fact that the shingles were defective, mislabeled, and not suitable for their intended use.

185.    Because the shingles related to the habitability of persons' homes, GAF had a duty to consumers and to the public to disclose the defective nature of their shingles and not to conceal and suppress the defective nature of the product from Plaintiff and the putative class members.

186.     GAF, however, engaged in a scheme to cover up the true nature of the problems.  This scheme included the concealment of GAF's "cracking teams" and its internal acknowledgement that it had been using inadequate materials for Timberline shingles.  This scheme also included GAF's attempts to keep information about the defective nature of the shingles out of the public domain by failing to inform consumers, contractors, and code officials that its Timberline shingles did not meet ASTM standards.

187.     To this day, GAF continues this concealment and suppression by failing to inform the public about the unsuitability of the shingles for their intended use and their non-compliance with ASTM standards.  As the manufacturer, seller and distributor of consumer products, GAF had a duty to provide such information.

188.     As a direct, proximate and foreseeable result of GAF's failure to instruct or to warn, Plaintiff and the proposed members of the class suffered damage.

189.     As a result of GAF's failure to instruct or to warn, Plaintiff and the putative class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, unreasonably dangerous, and unsuitable for their intended use.

190.     As a result of GAF's failure to instruct or to warn, Plaintiff and the putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, damage to property other than the GAF shingles, consequential, and incidental damages.

191.     As a direct, proximate and foreseeable result of GAF's negligence, Plaintiff and the putative class members have been damaged in an amount to be determined at trial.

## Count V

## (New Jersey Consumer Fraud Act)

192.     Plaintiff and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

193.     The New Jersey Consumer Fraud Act, N.J.S.A § 56:8-1 *et seq.,* states:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

194.     Plaintiff and GAF are each a "person" as defined by N.J.S.A § 56:8-1(d).

195.     By engaging in the conduct described herein, GAF violated N.J.S.A § 56:8-2 by falsely and deceptively labeling and advertising its fiberglass shingles as being safe and approved for use and complying with ASTM D3462 and by concealing, suppressing, or omitting material facts about the substandard quality and defects in the shingles.

196.     GAF violated N.J.S.A § 56:8-2, as more fully described herein, by its conduct including its:

- Fraudulent, misleading, and deceptive statements and practices relating to the compliance of Timberline shingles with ASTM D3462;

- Fraud and misrepresentation by knowing omission of information about the defective nature of Timberline shingles, the improper design and manufacture of the products, and GAF's knowledge of those defects;

- Fraudulent, misleading, and deceptive statements and practices relating to the sale of shingles that did not meet the applicable standards or codes and used substandard materials in direct contradiction to GAF's sales and marketing of

those shingles including the 30 or 40-year warranted life of the shingles for which Plaintiff and the class members paid a premium over shingles with a shorter warranted life; and

•     Concealment of the true nature of its defective shingles.

197.   When making the intentional misrepresentations and engaging in the concealment, suppression, and omission of material facts set out in this First Amended Complaint, GAF intended that Plaintiff, her representatives, roofing distributors and contractors, local authorities, and other consumers would rely upon the deceptive acts described in this First Amended Complaint.

198.   As a result of GAF's unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation and knowing concealment, suppression, or omission of material facts relating to the sale of GAF Timberline shingles, Plaintiff and members of the putative class have suffered actual damages in that they have purchased and installed in homes and structures shingles that are defective, not in compliance with code requirements, and that are of less value than what was warranted by GAF.

199.   As a result of GAF's unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation and knowing concealment, suppression, or omission of material facts relating to the sale of GAF Timberline shingles, Plaintiff and members of the putative class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, damage to property other than the GAF shingles and consequential and incidental damages.

200.   Pursuant to N.J.S.A § 56:8-19, Plaintiff and the putative class will seek damages and remedies allowed by that section and will, because of the willful deceptive acts

alleged in this First Amended Complaint, ask the Court to treble damages and award attorneys' fees and expenses.

## Count VI

### (Violation of the South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-10, *et seq.*)

201.    Plaintiff and proposed class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

202.    The South Carolina Unfair Trade Practices Act ("UTPA"), S.C. Code § 39-5-10, *et seq.*, prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  S.C. Code § 39-5-20.

203.    Plaintiff and class members qualify as "persons" under the UTPA.  S.C. Code § 39-5-10(a).

204.    GAF's manufacturing, marketing and sale of the shingles purchased by Plaintiff and the Class qualifies as "trade" and/or "commerce" under the UTPA.  S.C. Code § 39-5-10(b).

205.    Defendant has engaged and continue to engage in conduct that violates the UTPA.

206.    GAF made the misrepresentation that its shingles had the qualities and characteristics listed in this Complaint, which are hereby incorporated here, including that they met ASTM D3462 requirements, that they would last 25 years, that they were of superior quality, that they were durable and that they were able to withstand a number of conditions.

207.     GAF also misrepresented that its shingles could be used for normal purposes without prematurely failing.

208.     GAF also made misrepresentations, by omission, of information about the defective nature of Timberline shingles, the improper manufacture of the shingles, and GAF's knowledge of those defects.

209.     Defendant's conduct thus constitutes a violation of the UTPA. Plaintiff and class members have suffered actual damages and an ascertainable loss caused by GAF's misrepresentations, in that they have purchased and installed in homes and structures shingles that are defective, not suitable for their intended use, and not in compliance with ASTM D3462.  There is a causal nexus between GAF's actions and the loss suffered by the Plaintiff and the Class.

210.     Plaintiff and class will suffer damages that include not only the full cost to replace their shingles, but also include, without limitation, property damage, consequential and incidental damages.

211.     As a direct, proximate and foreseeable result of GAF's violation of the South Carolina Unfair Trade Practices Act, Plaintiff and class members sustained damages in an amount to be determined at trial.

## Count VII

### (Declaratory and Injunctive Relief)

212.     Plaintiff and the putative class members reallege the foregoing paragraphs, inclusive, as though fully set forth herein.

213.    Pursuant to Rule 23(b)(3) and (2) of the Federal Rules of Civil Procedure, the equitable power of this Court, and any applicable statute or rule providing for declaratory and / or injunctive relief, Plaintiff and the putative class members seek a declaratory judgment as follows:

a.    To the extent GAF alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the warranties fail of their essential purpose because the remaining remedies provided therein are inadequate and deprive the class of the benefit of the bargain of their purchases, because GAF at the time of sale and thereafter concealed and suppressed that the Timberline shingles were defective, and because the provisions are otherwise unconscionable;

b.    To the extent GAF alleges that any pretend limitations, restrictions or disclaimers of express warranty preclude full recovery of damages, the same is unconscionable because the warranties do not provide adequate remedies because the defect in the shingles is latent and because the class members lacked sufficient bargaining power;

c.    That GAF's attempted disclaimers of warranties or limitations of remedies are ineffective because GAF failed to deliver them to the consumer or their representatives at the time of sale of the Timberline shingles;

d.    That GAF cannot disclaim certain claims or remedies, including claims brought under state consumer protection laws;

e.    That GAF's attempts to condition express warranty payments on demands made to consumers that were never part of an express warranty are unlawful and must be stopped;

f.    That GAF be forced to advise prior warranty claimants that its attempts to condition express warranty payments on demands made to consumers that were never part of an express warranty were unlawful;

g.    That the Timberline shingles are unsuitable for their intended use because they do not comply with ASTM D3462;

h.    That the Timberline shingles need to be replaced because they do not comply with ASTM D3462; and

i.    To the extent GAF has had an adverse adjudication against it arising from the subject matter of this First Amended Complaint, that the putative class may

use offensive collateral estoppel against GAF for the rulings and determinations therein.

## Count VIII

### (Fraudulent Concealment / Equitable Tolling)

214.    Plaintiff and the putative class members re-allege the foregoing paragraphs, inclusive, as though fully set forth herein.

215.    The substandard and non-conforming nature of GAF Timberline shingles is not perceptible to a reasonable consumer.

216.    By knowingly selling shingles that it knew would not last the 30 or 40-year warranted life and that it knew did not comply with ASTM D3462 at the time of sale and installation but nonetheless labeling the shingles as complying with that standard, thereby making them suitable for use in homes and other structures, GAF affirmatively concealed Plaintiff's causes of action and the claims of the members of the putative class.

217.    GAF's mislabeling of the Timberline shingles was an affirmative act that was intended to prevent, and did in fact prevent Plaintiff and members of the putative class from discovering their potential claims.  Because of the nature of concealment and the testing needed to discover non-compliance with ASTM D3462, Plaintiff and members of the putative class could not, even with the exercise of due diligence, have independently discovered their cause of action.

218.    To this day, GAF has continued this concealment and suppression by failing to inform the public about the unsuitability of its Timberline shingles, the creation of its "cracking teams," its conclusion that it had been using substandard materials, and other deficiencies described herein.

219.    Based on this conduct and the allegations herein, GAF is estopped from relying on any statute of limitations or other time-related defense in this action. GAF affirmatively misrepresented and actively concealed the true nature, character, and quality of the Timberline shingles and, for the reasons described herein, was under a continuous duty to disclose to Plaintiff and the putative class the facts it omitted and concealed. Plaintiff and the members of the putative class reasonably relied upon GAF's misrepresentations and active concealment in not sooner bringing the claims asserted herein.

220.    As a result of GAF's fraudulent concealment, equity requires that the statute of limitations on Plaintiff's and the putative class members' claims to be tolled.

## Prayer for Relief

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief against GAF as follows:

1.    Certification of this matter as a class action and appointing Plaintiff and her counsel to represent the class;

2.    Compensation for damages suffered by Plaintiff and the putative class members;

3.    Award of reasonable attorneys' fees and costs and disbursements incurred herein;

4.    Award of additional damages, remedies, and penalties available by law;

5.    Requiring GAF to initiate a post-sale instruction and warning campaign, to conduct further testing, and to refrain from making unlawful representations about warranty claims;

6.    Declaring the rights and obligations of the parties as prayed for; and

7.    Such other and further relief the Court deems just and equitable.

Dated: May 1, 2012                     /s/Patrick F. Madden
                                       Patrick F. Madden
                                       Lawrence Deutsch
                                       Shanon J. Carson
                                       BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
                                       Philadelphia, PA  19103
                                       Tel: (215) 875-4656
                                       Fax: (215) 875-4604
                                       Email: scarson@bm.net

                                       **Attorneys for Plaintiff**


## PROOF OF SERVICE

I hereby certify that on May 1, 2012, I electronically filed the foregoing Interested Party Response with the Clerk of Court using the Court's CM/ECF system which will send notification of such filing to all counsel of record.


Dated: May 1, 2012                     /s/ Patrick F. Madden
                                       Patrick F. Madden
                                       Lawrence Deutsch
                                       Shanon J. Carson
                                       BERGER & MONTAGUE, P.C.
                                       1622 Locust Street
                                       Philadelphia, PA  19103
                                       Tel: (215) 875-4656
                                       Fax: (215) 875-4604
                                       Email: scarson@bm.net

                                       **Attorneys for Plaintiff**